## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF LOUISIANA

IN RE:

**MARK PATRICK FRITSCHER, II**                                    **CASE NO. 23-10794**
     **DEBTOR**                                                   **CHAPTER 7**

**JENNA SMITH FRITSCHER**
**PAMELA SMITH**
**MICHAEL SMITH**
     **PLAINTIFFS**

**VERSUS**                                                         **ADVERSARY NO. 24-1005**

**MARK PATRICK FRITSCHER, II**
     **DEFENDANT**

### MEMORANDUM OPINION

This adversary proceeding was filed by Michael and Pamela Smith (sometimes "the Smiths") and Jenna Smith Fritscher ("Jenna") (collectively, "Plaintiffs"), seeking separate money judgments for damages associated with the demise of a business and declaratory relief that those claims, if any, should be excepted from the discharge of Mark Patrick Fritscher, II ("Patrick" or "Defendant"). With the consent of the parties, the related Objections to the Proofs of Claims of Plaintiffs filed by Patrick in the underlying case were consolidated at trial.[1] Trial was held over three days on December 5, 6, and 10, 2024. The parties were afforded time to file post-trial briefs, and the court took the matter under advisement upon those filings being timely made on January 8, 2025. Shortly thereafter, Defendant filed a Motion to Strike[2] with respect to an exhibit attached to Plaintiffs' post-trial brief and certain arguments made in the brief alleged to be beyond the record of the case. Plaintiffs objected, and a hearing was held on February 5, 2025. The court granted the

---

[1] Case no. 23-10794, P-71.

[2] P-135.

motion. As a result, the exhibit is disregarded in its entirety, and the following opinion expressly

avoids drawing any inferences, negative or otherwise, concerning Patrick's failure to explain

what happened.  Simply put, the Plaintiffs have the burden of proof.

## I.  Jurisdiction, Venue, and Core Status

This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334

and 157. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The matter largely

constitutes a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(B) and (I). With respect to

issues non-core in nature, the parties expressly consented to this court's power and authority to render

a final money judgment.[3]  As explained in detail below, however, the court declines, on abstention

grounds, to render a final money judgment with respect to the alleged damage claims of Jenna.  These

issues, in the court's view, are intricately linked to the partition of former community property pending

in the state court proceeding.

## II.  Facts

The court's recitation of facts and its rulings in this case are heavily dependent on the

credibility of the witnesses. After hearing all four parties testify, the court found the Plaintiffs'

testimony credible and the Defendant's less so.

The background is particularly important in this case.  Patrick holds a bachelor's degree

in business administration and worked as an operations consultant at Smoothie King's corporate

headquarters for six years after college.  He married Jenna on April 5, 2014.  The Smiths are

Jenna's parents.

In the summer of 2014, Sean Cangelosi ("Sean"), who was already operating several

successful Smoothie King franchise locations, approached Patrick about going into business with

---

[3] P-17.

him.  Patrick testified that he believed this happened because of Patrick's position and high regard with Smoothie King's headquarters.  Indeed, Patrick boasted that he had helped Sean's "stores become more profitable."[4] On September 15, 2014, Patrick and Sean organized Lake Mall, LLC ("Company"), a Louisiana limited liability company, for the purpose of owning and operating two Smoothie King stores: one in the Mall of Louisiana ("Mall Store") and the other at Our Lady of the Lake Regional Medical Center ("OLOL Store").[5] The plan, according to Patrick's testimony, was to grow the business beyond the two original stores (sometimes collectively, "the Stores").[6]  Patrick borrowed $50,000 from the Smiths to use as part of his initial contribution to the Company.[7]   It is undisputed that Patrick paid the Smiths back all but $6,740 on that loan.[8]

Patrick and Sean each held a 50% membership interest in the Company and jointly managed the Stores.[9]  According to Patrick, the Stores did very well and were named "King's Club" stores by Smoothie King, which means they were in the top 10 percent of stores regarding operations.[10]

By October 2017, Patrick wanted to buy out Sean's interest and go it alone.  He could not truly go it alone however, leaning on the Smiths and his own father for the money necessary to

---

[4] Trial Transcript, 12/05/24, P-128, p. 30.

[5] Joint Exhibit F – Articles of Organization dated September 15, 2014.

[6] Trial Transcript, 12/05/24, P-128, p. 110.

[7] Mark also borrowed funds from Red River Bank. Trial Transcript, 12/05/24, P-128, p. 31.

[8] Mark listed the Smiths as an unsecured creditor on Schedule E/F in the amount of $6,740. Case no. 23-10794, P-5, p. 15.

[9] Joint Exhibit H – Joint Stipulation of Testimony of Sean Cangelosi if Called to Testify.

[10] Trial Transcript, 12/05/24, P-128, pp. 34, 36.

buy out Sean's 50% membership interest. Patrick and Sean agreed that the 50% interest was worth $286,000.[11] For the remainder of this ruling, the court views the value of the Company as being <u>at least</u> $572,000 as of October of 2017.[12] The buy-out was funded, in part, with $80,000 contributed by the Smiths.[13] In exchange for the contribution, the Smiths received an undivided 10% interest in the Company.[14] The Smiths were not involved in day-to-day operations. Patrick was its manager,[15] and at that time, received a monthly salary of $6,000.[16] Mr. Smith testified that the total amount of distributions the Smiths received from the Company for their 10% interest was $5,700.[17] This testimony was not refuted or challenged on cross examination.

### A. The Mall Store

The Mall Store was profitable, at least until a shooting at the Mall of Louisiana. Patrick testified that the shooting occurred in the second or third quarter of 2019.[18] The court takes judicial notice of the local newspaper article in *The Advocate*, which indicates that the shooting took place consistent with Patrick's testimony on June 29, 2019.[19] Patrick testified the shooting

---

[11] Joint Exh. C, - Act of Sale of LLC Interest. The Act of Sale of Sean's 50% membership interest to Mark is dated 10/4/17, but the uncontested facts in the joint pretrial order provide that it was 10/14/17. P-95, p. 5.

[12] No evidence was adduced at trial regarding whether a 100% interest was worth more than two 50% interests.

[13] Plaintiffs' Exhibit 11. Mark also borrowed funds from Gulf Coast Bank. Trial Transcript, 12/05/24, P-128, p. 39.

[14] Joint Exh. E – Act of Sale of LLC Interest. The Act of Sale of a 10% membership interest from Mark to the Smiths is effective October 12, 2017; however, it was not signed until March 31, 2019.

[15] Trial Transcript, 12/05/24, P-128, p. 85.

[16] Trial Transcript, 12/05/24, P-128, p. 255.

[17] Trial Transcript, 12/05/24, P-128, pp. 234-35.

[18] Trial Transcript, 12/5/24, P-128, p. 115.

[19] "*14-year-old girl shot near Mall of Louisiana in Baton Rouge, police say; 4th shooting in 24 hours*." *The Advocate*. https://www.theadvocate.com/baton_rouge/news/crime_police/14-year-old-girl-shot-near-mall-of-louisiana-in-baton-rouge-police-say-4th/article_5ac46c50-9adf-11e9-a423-e79b923ad288.html?utm_medium=social&utm_source=email&utm_campaign=user-share. Accessed February 12, 2025.

impacted the Company negatively, resulting in a temporary 30% to 40% drop in revenue for a few months.  He also conceded that revenues went back up thereafter, which would mean roughly by the end of August.[20]  During this time when the Mall Store was struggling, Patrick unilaterally and unbeknownst to the Smiths increased his salary to $7,600 per month. A few months after things normalized at the Mall Store, specifically in November 2019, the Smiths wired Patrick an additional $12,000, with the express requirement that the wire proceeds be deposited into the Company bank account.[21]  Ostensibly this loan was designed to help continue the recovery from the aftermath of the shooting. The Smiths did not receive any additional membership interest based on this transaction, nor were any loan documents executed.

Unfortunately, beginning on March 16, 2020, the Mall Store was forced to close for 90 days due to the Covid-19 pandemic ("Pandemic") because it was not considered an essential business.  The Company still owed rent, however, even while the Mall Store was closed because the lease did not contain a *force majeure* clause.[22] Patrick testified that when the Mall Store was allowed to reopen, sales averaged only $16,000 per month, rather than the $50,000 monthly sales average enjoyed prior to the Pandemic.[23] The lease on the Mall Store was up for renewal on December 31, 2020.  It is undisputed that the landlord would not renew for less than a 10-year term.  Jenna testified that she and Patrick agreed that a ten-year lease was too much of a commitment, so the Company did not renew the lease.[24] No evidence was adduced at trial

---

[20] Trial Transcript, 12/05/24, P-128, p. 115.

[21] Plaintiffs' Exhibit 11.

[22] Trial Transcript, 12/05/24, P-128, p. 117.

[23] Trial Transcript, 12/05/24, P-128, p. 119.

[24] Jenna testified that a 10-year lease term was too much of a gamble.  Trial Transcript, 12/06/24, P-129, p. 524.

suggesting the Smiths had any say in the decision to close The Mall Store. That location closed permanently on December 31, 2020, or over a year after the last monetary investment/loan made by the Smiths. Patrick, on behalf of the Company, sold the furniture, fixtures, and equipment ("FF&E") for $3,000.[25] Importantly, no testimony, expert or otherwise, touched on the issue of what impact the Mall Store's closing had on the value of the Company.

### B. The OLOL Store

The Company's monthly rent at the OLOL Store was $3,500 plus 12% of sales over $350,000.[26] The parties agreed that the OLOL Store was profitable prior to the Pandemic and was open 24 hours per day. It was closed for a time due to the Pandemic on March 16, 2020, again as a non-essential business. When it reopened, it was open only limited hours.[27] Patrick testified that sales were down due to Pandemic restrictions on who could enter the hospital, while at the same time, food and labor costs increased.[28] Despite declining profits, Patrick increased his salary to $9,250 per month in 2020.[29]

Around this same time, Jenna and Patrick were having marital problems. They separated and reunited several times, and she filed a Petition for Divorce in April 2020.[30] They reunited for two months during 2020.[31]

---

[25] Trial Transcript, 12/05/24, P-128, p. 69.

[26] Trial Transcript, 12/05/24, P-128, p. 62.

[27] Patrick testified that the fewest hours it was open was seven or eight hours per day. Trial Transcript, 12/05/24, P-128, p. 47.

[28] Trial Transcript, 12/05/24, P-128, p. 120.

[29] Pamela Smith testified as to Patrick's unilateral salary increases. Patrick did not refute her testimony. Trial Transcript, 12/05/24, P-128, p. 257.

[30] The parties testified as to the reasons for the divorce, but those reasons are not germane to this ruling.

[31] Trial Transcript, 12/06/24, P-129, p. 511. La. C.C. art. 104 provides that "[t]he cause of action for divorce is extinguished by the reconciliation of the parties."

During the Pandemic, the Company received the following loans and grants totaling $720,000:

1) two $150,000 economic development loans from the U.S. Small Business Administration ("SBA") for a total of $300,000,[32]

2) a $289,000 grant from the Restaurant Revitalization Fund,[33]

3) a $15,000 grant for the State of Louisiana, and

4) two $58,000 loans from the Paycheck Protection Program ("PPP") for a total of $116,000; these loans were forgiven by the federal government.[34]

Things worsened apparently on the marital front, and Jenna filed an Amended Petition for Divorce on April 27, 2022. This time, she changed the grounds for divorce pursuant to La. C.C. art. 103(1).[35] On July 6, 2022, Jenna and Patrick were granted a Judgment of Divorce[36] pursuant to La. C.C. art. 103(1)[37] and 103.1(2)[38] and La. C.C.P. art. 1702(F).

---

[32] Patrick listed the $300,000 debt to the SBA as an unsecured debt in Schedule E/F. Case no. 23-10794, p. 16. He testified that he got the first of those loans in June 2021 and the second roughly one year later. Trial Transcript, 12/05/24, P-128, p. 51-52.

[33] Patrick testified that he immediately used it to pay $89,000 in state sales taxes. Trial Transcript, 12/05/24, P-128, p. 52.

[34] Trial Transcript, 12/05/24, P-128, pp. 58, 61.

[35] Trial Transcript, 12/06/24, P-129, p. 511, 570. *See also* Joint Pretrial Order, P-95, p. 5.

[36] Joint Exhibit G.

[37] La. C.C. art. 103(1) provides:

Except in the case of a covenant marriage, a divorce shall be granted on the petition of a spouse upon proof that:

(1) The spouses have been living separate and apart continuously for the requisite period of time, in accordance with Article 103.1, or more on the date the petition is filed. …

[38] La. C.C. art. 103.1(2) provides:

The requisite periods of time, in accordance with Articles 102 and 103 shall be as follows: …

The rocky marriage undoubtedly contributed to the animosity brewing between Patrick and the Smiths. The Smiths testified,[39] and Patrick admitted,[40] that the Smiths repeatedly asked to see the books and records of the Company. At various times, Patrick made excuses, promised to get the records to them, flatly denied their verbal requests, and ultimately directed the Smiths to his accountant, Jude Guerrin. Mr. Smith testified that Mr. Guerrin would not give them the books either.[41] The Smiths testified that over a year after their initial request, they received some records from Patrick's attorney, but the records were incomplete and "scrambled."[42] One of the reasons given for wanting to see the books and records was the Smiths' perceived impression that Patrick was living a lavish lifestyle well beyond his salary constraints while at the same time not making any distributions on account of their 10% interest.

Then things escalated in 2022. Specifically, on February 14, 2022, Patrick sent the Smiths a text telling them, "I'm about to crush you financially …"[43] That same day, Patrick also texted the Smiths, "Jenna is going down, just get ready."[44] Several months later, on August 24, 2022, Patrick sent Jenna a text telling her that he was going to make her parents "pay dearly."[45]

---

(2) Three hundred sixty-five days when there are minor children of the marriage at the time the rule to show cause is filed in accordance with Article 102 or a petition is filed in accordance with Article 103.

[39] Trial Transcript, 12/05/24, P-128, pp. 222, 233-35.

[40] Trial Transcript, 12/05/24, P-128, p. 87-89.

[41] Trial Transcript, 12/05/24, P-128, p. 235.

[42] Trial Transcript, 12/05/24, P-128, p. 235. Trial Transcript, 12/06/24, P-129, p. 430.

[43] Plaintiffs' Exhibit 3, p. 1.

[44] Plaintiffs' Exhibit 3, p. 1.

[45] Plaintiffs' Exhibit 3, p. 3.

Between 2019 and 2022, Plaintiffs allege that Patrick used the Company's funds to pay his personal expenses. Patrick admitted to spending the Company's funds on personal clothing, expenses for his children, his gym membership, and expenses for personal vehicles, such as fuel, parts, and insurance.[46] Of particular concern to the Smiths was Patrick's expensive motocross racing endeavor. Plaintiffs also challenged the Company's funds spent by Patrick on personal meals at Another Broken Egg and George's.[47] Patrick also charged quite a few overnight travel expenses and luxury hotel stays.[48]

In early January 2023, Jenna went to Our Lake of the Lake Regional Medical Center ("Medical Center"), and the OLOL Store had been, in her words, "abandoned."[49] The property manager for the Medical Center, Beau Box, sent a letter to Patrick on January 25, 2023, advising him that the Company owed $91,868.15 in rent and afforded 10 days opportunity to cure.[50] Obviously, the Medical Center would not allow the OLOL Store to continue operating without bringing the past due rent current.[51] Failure to cure the arrearage was tantamount to the Company's demise, and with it, all remaining value to the membership interests. Despite having received over $700,000 in loans and grants for Pandemic relief, the Company did not pay the balance due on the rent. The OLOL Store closed for good on January 26, 2023.[52] Consistent with

---

[46] Trial Transcript, 12/05/24, P-128, pp. 133, 155-56, 163, 165, 168, 170, 173, 175, 180, 185, 187, 188, 189, 191, 196, 198.

[47] Trial Transcript, 12/06/24, P-129, pp. 515, 517.

[48] Trial Transcript, 12/06/24, P-129, p. 513.

[49] Trial Transcript, 12/06/24, P-129, pp. 536-38.

[50] Trial Transcript, 12/05/24, P-128, p. 73-74. Patrick testified that during the Pandemic, he believed he did not have to pay the 12% of sales. Trial Transcript, 12/05/24, P-128, p. 62. The court does not find his testimony on this issue credible.

[51] Trial Transcript, 12/05/24, P-128, p. 269.

[52] Trial Transcript, 12/05/24, P-128, p. 47.

Jenna's testimony concerning abandonment of the location, the Company did not sell the FF&E either, but instead left it in place.[53]

Thereafter, Sean reopened a Smoothie King in the exact same location as the OLOL Store on May 15, 2023, and is using the Company's FF&E.[54] It is undisputed that the Company received nothing from Sean in connection with the reopening.[55]  At trial, the parties stipulated that if Sean was called to testify, he would state that he "continues to successfully operate the Store at OLOL on a profit basis."[56] No evidence was adduced at trial, however, concerning what Sean considers "successful operations" or the level of profitability currently enjoyed.  This court will not speculate.  The best the court can do is conclude that the OLOL location is not losing money now.

### C. Patrick's Bankruptcy Case

Patrick filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code on November 15, 2023.[57] The Smiths, jointly, filed a proof of claim on August 26, 2024, in the

---

[53] Patrick testified that the bank valued the FF&E at $40,000 initially. Trial Transcript, 12/05/24, P-128, p. 79.  He also testified that the bank decided not to seize the FF&E as not being "worth their time and money."  Trial Transcript, 12/05/24, P-128, p. 81.

[54] Joint Exhibit H.

[55] This statement should not be construed as the court's belief that Sean should have paid the Company something to take over the location.

[56] Joint Exhibit H.

[57] Case no. 23-10794.

aggregate amount of $200,000.00.[58] Jenna filed a proof of claim on August 26, 2024, in the aggregate amount of $230,204.00.[59] Patrick filed separate objections to the claims.[60]

The Plaintiffs commenced this adversary proceeding against Patrick on February 20, 2024.  They contend that Patrick committed "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" such that their claims against him are nondischargeable pursuant to 11 U.S.C. § 523(a)(4). Additionally, they contend that their claims are nondischargeable based on "willful and malicious injury by the debtor" pursuant to 11 U.S.C. § 523(a)(6).  Jenna also seeks a declaratory judgment regarding excepting child support obligations from discharge pursuant to 11 U.S.C. § 523(a)(5). While the Smiths and Jenna seek declaratory relief on similar grounds, their underlying claims under applicable Louisiana law are different and therefore must be analyzed separately.

### III.  The Smiths' Claims

The proof of claim filed by the Smiths is viewed by the court as merely a placeholder. Accordingly, the court will focus its attention on their case to prove monetary damages under applicable Louisiana law.  The Smiths' money damage claims are contract-based, specifically for the contributions, advances, and loans totaling $142,000[61] made to Patrick and their corresponding rights as a 10% member of the Company.[62] The parties do not dispute that an early

---

[58] Proof of Claim 5. The original claim, claim 5-1, was signed by the Smith's counsel, Jeffrey Wittenbrink. The Smiths subsequently amended it with their signatures. Claim 5-2.

[59] Proof of Claim 6. Mr. Wittenbrink signed Jenna's original proof of claim, claim 6-1.  Jenna subsequently amended it with her signature. Claim 6-2.

[60] Case no. 23-10794, P-60, 63, 67, 68.

[61] Paragraph 12 of the Complaint alleges the Smiths invested $92,000, which testimony clarified included $80,000 advanced to Patrick to help him buy out Sean in October of 2017, and $12,000 loaned to him after the mall shooting in late 2019.  It also alleges that an earlier $50,000 loan to Patrick has been partially repaid.

[62] Although the answer to paragraph 12 of the Complaint denies the allegations, the answer further clarifies that "Plaintiffs invested in the company in exchange for a 10 percent interest."

loan of $50,000 had a remaining balance due of only $6,740 as of the date of the bankruptcy.[63]

The parties also agree that the Smiths received $5,700 in member distributions early on but no

more.  Thus, the court finds the net "out of pocket" claim of the Smiths is $93,040.[64]  This

amount does not include any claims they assert related to questionable expenses,

misappropriation, or lost profits.  In fact, in their post-trial memorandum, the Smiths also ask for:

   a.  $24,800.00 for using Company funds to pay personal expenses,

   b.  $275,000.00 for lost profits, and

   c.  $16,800.00 for misappropriation and misuse of FF&E for both stores.[65]

     Again, it is undisputed that the Smiths hold a 10% membership interest in the

Company.  They contend that Patrick, as the manager of the Company, had a fiduciary

duty to act in good faith and as a prudent operator.  They claim he breached that duty to

them as members by (1) refusing to let them see the Company's books and records for

over a year, (2) spending business funds on personal expenses, (3) failing to pay the rent

for the OLOL Store despite receiving over $700,000 in Pandemic assistance, (4)

unilaterally increasing his salary when the business was struggling, and (5) failing to

preserve FF&E.

     Louisiana law is clear that a member who manages a limited liability company ("LLC")

has a fiduciary duty to the other members. La. R.S. 12:1314 provides in pertinent part:

---

[63] Patrick's Schedule D filed in his bankruptcy case under penalty of perjury shows the Smiths as holders of an undisputed unsecured claim for $6,740.

[64] $6,740 plus $92,000 less $5,700.

[65] P-131, p. 22,

A. Subject to the provisions of R.S. 12:1315, a member, if management is reserved to the members, or manager, if management is vested in one or more managers pursuant to R.S. 12:1312:

> (1) Shall be deemed to stand in a fiduciary relationship to the limited liability company and its members and shall discharge his duties in good faith, with the diligence, care, judgment, and skill which an ordinary prudent person in a like position would exercise under similar circumstances. Nothing contained in this Section shall derogate from any indemnification authorized by R.S. 12:1315….

B. Notwithstanding the provisions of Subsection A of this Section, a member or manager shall not be personally liable to the limited liability company or the members thereof for monetary damages unless the member or manager acted in a grossly negligent manner as defined in Subsection C of this Section, or engaged in conduct which demonstrates a greater disregard of the duty of care than gross negligence, including but not limited to intentional tortious conduct or intentional breach of his duty of loyalty.

C. As used in this Section, "gross negligence" shall be defined as a reckless disregard of or a carelessness amounting to indifference to the best interests of the limited liability company or the members thereof.

D. A member or manager who makes a business judgment in good faith fulfills the duty of diligence, care, judgment, and skill under Subsection A of this Section if the member or manager:

> (1) Does not have a conflict of interest with respect to the subject of the business judgment.

> (2) Is informed with respect to the subject of the business judgment to the extent the member or manager reasonably believes to be appropriate under the circumstances.

> (3) Rationally believes that the business judgment is in the best interests of the limited liability company and its members.

E. A person alleging a breach of the duty of diligence, care, judgment, and skill owed by a member or manager under Subsection A has the burden of proving the alleged breach of duty, including the inapplicability of the provisions as to the fulfillment of the duty under Paragraph A(2) and Subsection D, and, in a damage action, the burden of proving that the breach was the legal cause of damage suffered by the limited liability company.

In *Risk Mgmt. Servs., L.L.C. v. Moss*,[66] the court interpreted La. R.S. 12:1314, finding that "[i]n determining whether a member of an LLC has breached a fiduciary duty to the LLC and its members, at minimum, a gross negligence standard and the business judgment rule is employed."

Testimony at trial revealed that Patrick breached his fiduciary duty to the Smiths by spending the Company's funds to pay for at least $48,933.43 of personal expenses from 2019 through 2022, broken down as follows:

(a) Meals - $7,108.10;

(b) Clothing, Medical, and Family - $2,774;

(c) Fuel and Auto Parts - $22,430;

(d) Motocross Racing - $9,085.33; and

(e) Hotels and Travel - $$7,536.00.

Patrick tried to explain or justify all these challenged expenses.  The court was not convinced.  Further, in what the court views as a telling attempt to hide his mismanagement of the Company, Patrick refused to allow the Smiths to see the books and records of the Company, as was their right pursuant to La. R.S. 12:1319(B).[67]  The Smiths testified time and again

---

[66] *Risk Mgmt. Servs., L.L.C. v. Moss*, 09-632 (La. App. 5 Cir. 4/13/10), 40 So. 3d 176, *writ denied,* 2010-1103 (La. 9/3/10), 44 So. 3d 683.

[67] La. R.S. § 12:1319(B) provides in pertinent part:

B. Unless otherwise provided in the articles of organization or an operating agreement, a member may do any of the following:

(1) At the member's own expense, inspect and copy any limited liability company record upon reasonable request during ordinary business hours.

(2) Obtain from time to time upon reasonable demand the following:

(a) True and complete information regarding the state of the business and financial condition of the limited liability company.

(b) Promptly after becoming available, a copy of the limited liability company's federal and state income tax returns for each year.

throughout the trial, and consistently, that they asked for the books several times.  They also testified that they thought the significant Pandemic grants and loans should have resulted in a rosier picture for the Company.  Based on the testimony of all the witnesses, the court finds it more likely than not Patrick refused to show them the books to conceal his misuse of Company funds.  Texts from Patrick in February and August 2022 revealed his overt intent to cause financial harm to the Smiths.[68]  But the most damaging breach, in the court's view, was his failure to use some of the Pandemic aid to keep the OLOL Store from closing.  The record is unclear what Patrick did with over $700,000 in loans and grants for Pandemic relief, and the court draws no inference from that.  But it cannot be denied or ignored by this court that none of it was employed to pay the back rent owed on the OLOL Store totaling $91,868.15.[69]  The court expressly finds that Patrick's failure to pay the OLOL Store back rent was the legal cause leading to the demise of the Company, and with it, any value to the member interests.

Pursuant to La. R.S. 12:1314(B), Patrick's actions must rise to the level of "gross negligence" for him to be liable to the Smiths.  "Gross negligence" is defined in La. R.S. 12:1314(C) as "a reckless disregard of or a carelessness amounting to indifference to the best interests of the limited liability company or the members thereof."  Based on the testimony and credibility of witnesses and Patrick's text messages, the court finds that the Smiths have easily

---

(c) Other information regarding the affairs of the limited liability company as is just and reasonable.

(3) Demand a formal accounting of the limited liability company's affairs whenever circumstances render it just and reasonable.

[68] On February 14, 2022, Patrick sent the Smiths a text telling them, "I'm about to crush you financially …" Plaintiffs' Exhibit 3, p. 1.  On August 24, 2022, Patrick sent Jenna a text telling her that he was going to make her parents "pay dearly." Plaintiffs' Exhibit 3, p. 3.

[69] Trial Transcript, 12/05/24, P-128, p. 73-74. Patrick testified that during the Pandemic, he believed he did not have to pay the 12% of sales. Trial Transcript, 12/05/24, P-128, p. 62. The court does not find his testimony on this issue credible.

carried their burden that Patrick was, at a minimum, grossly negligent in his management of the Company.  Indeed, this court finds that Patrick intentionally ran the Company into the ground to hurt the Smiths financially.  Those efforts devalued their membership interest to zero.  Mission accomplished.

Determining the extent of the damages the Smiths suffered is a bit trickier.  In this case, the court relies on the concept of "expectation damages" as the appropriate measure of damages.  In *In re Bankston*,[70] the United States Fifth Circuit found:

> Louisiana has embraced the contract damages principle of "expectation" damages. 6 La. Civ. L. Treatise, Law Of Obligations § 14.3 (2d ed.) (citing Fuller and Perdue, "The Reliance Interest in Contract Damages," 46 Yale L.J. 52, (1936) and Farnsworth, Contracts 871 to 872 (2d ed.1990)). Under this principle, the general purpose of contract damages is not to punish breaching parties or enrich non-breaching parties, but rather to produce the same result as would have occurred if there was no breach. As stated by the Louisiana Supreme Court, the calculation of damages should place the non-breaching party "in the same position he would have been in" had the contract been fulfilled. *Gibbs Const. Co., Inc. v. Thomas,* 500 So.2d 764, 770 (La.1987); *see also* Restatement (Second) of Contracts § 344 (1981).[71]

In this case, the pertinent question is what were the Smiths' reasonable expectations at the time they expended loans or made investments in Patrick's business venture?  This inquiry must not rely on hindsight.   Here, the record is replete with testimony from Patrick himself about his highly impressive track record operating Smoothie King franchises, both at the corporate level for six years and for several years thereafter as a franchisee along with his partner at the time, Sean.  According to Patrick, they ran award-winning stores at a profit.  As mentioned previously, the Smiths' initial loan of $50,000 back in 2014 was being paid and had been almost completely paid off as of the date of the bankruptcy.  The record is clear that the Stores were doing well in

---

[70] *In re Bankston*, 749 F.3d 399 (5th Cir. 2014).

[71] *Id.* at 403.

October of 2017.  So well, in fact, that Sean demanded and received $286,000 for his half

interest.  And even by the time the last advance of $12,000 was made in November of 2019,

prospects for the Company had improved after a rough couple of months following the mall

shooting.  Indeed, at the time that last advance was made, the Smiths had no idea what lay ahead

with the escalating marital problems, the Pandemic, and the deterioration of their relationship

with Patrick.

The court finds that the Smiths had a reasonable expectation of getting their money back up

to and including the $12,000 advance made in November of 2019.  The Smiths' total outlay was

$142,000.  Instead, they recovered only $48,960, leaving a balance of $93,040.  And even if the

Pandemic is considered or bears upon those earlier expectations, which the court expressly

rejects for purpose of quantifying expectation damages, Patrick received over $700,000 in

Pandemic loans and grants yet chose not to pay the OLOL Store rent.  That decision, consistent

with his open animosity and threats of ruining the Smiths financially, was the final straw in his

plan to render the Company worthless.  This court holds that Patrick intentionally ruined the

Company, at least in part, so the Smiths would lose their investment.  An award of $93,040 in

damages would place the Smiths in the position they should have been in had no breaches of

fiduciary duty occurred, at least before consideration of any future lost profits or other damages.

### A. Use of Company Funds for Personal Expenses

The Smiths claim Patrick improperly diverted Company money for his own personal use

and benefit.  The Smiths' expert in Certified Public Accountancy, Ben Baudoin, testified that he

was unable to give a "formal opinion" on which expenses were personal because he did not have

the complete books and records of the Company.[72]  Despite being hamstrung, the court finds Mr.

---

[72] Trial Transcript, 12/05/24, P-128, p. 336.

Baudoin's opinion useful as to the which expenses were unusual for a food-service business like Smoothie King.  The court also believed the testimony of Jenna concerning the personal nature of many of the expenses, especially regarding hotel bills, restaurants, vehicle expenses, and Patrick's motocross racing hobby. These questionable expenses totaled almost $49,000 as itemized above.   However, awarding the Smiths additional damages of $4,900 based on their 10% interest in the Company would result in double counting.  While the inappropriate personal expenditures are evidence of a breach of fiduciary duty, any damages associated with these transgressions are subsumed within the $93,040 in expectation damages awarded above.

### B.  Lost Profits

The Smiths' claim for lost profits is problematic.  The court finds that the Smiths had a reasonable expectation in October of 2017 that they would, over time, receive 10% of future profits.  They did receive $5,700 in member distributions early on, at least in part justifying that expectation.  But on December 9, 2024, the court ruled on a Motion in Limine that the Plaintiffs' expert witness could only testify regarding subject matters contained in the expert report provided to Patrick in discovery.[73] The expert report did not contain any opinions on lost profits, and there was no testimony or written documents admitted into evidence even purporting to quantify lost profits at trial.  A belated attempt to admit evidence through an exhibit to their post-trial brief well after the close of the trial was rejected by the court.[74]  The court therefore finds that the Smiths did not prove any damages for lost profits.

---

[73] P-112.

[74] The Plaintiffs attempted to introduce a document into evidence after the trial by attaching it to their post-trial memorandum.  The court ruled at a hearing on February 5, 2025, that the exhibit will be stricken from the record. The court will enter an order striking it once a proposed order is submitted by Defendant's counsel.

### C. FF&E

The Mall Store closed permanently on December 31, 2020.   Patrick testified that the Company sold the FF&E for $3,000 and put that money into the Company.[75] The Plaintiffs did not refute Patrick's testimony or put on evidence as to what the FF&E should have sold for.

When the OLOL Store closed in January 2023, Patrick admitted to leaving the FF&E on site.[76]  Patrick testified that the bank had an interest in the FF&E and valued it at $40,000 initially.[77] The court makes no ruling on the value of the abandoned FF&E nor does this opinion give any credence to the hearsay testimony that the bank decided not to seize the FF&E as not being "worth their time and money."[78]  To be sure, abandoning the FF&E at the OLOL Store, just like the other findings of breaches of fiduciary duty, is part of the overall ruling that Patrick owes the Smiths damages.  But any separate damages for this breach are also subsumed within the $93,040 in expectation damages proved at trial.

## IV.  Jenna's Claims

Jenna's proof of claim is also a placeholder. [79]  In her post-trial memorandum, Jenna asked for damages totaling $1,424,700, comprised of the following:

1)  $111,600 for using Company funds to pay personal expenses,

2)  $1,237,500 for lost profits, and

---

[75] Trial Transcript, 12/05/24, P-128, p. 69.

[76] Trial Transcript, 12/05/24, P-128, p. 70.

[77] Trial Transcript, 12/05/24, P-128, p. 79.

[78] Trial Transcript, 12/05/24, P-128, p. 81.

[79] Proof of Claim 6. Mr. Wittenbrink signed Jenna's original proof of claim, claim 6-1.  Jenna subsequently amended it with her signature. Claim 6-2.  Jenna claims seek allowance of $230,204.00.

3) $75,600 for misappropriation and misuse of FF&E for both stores.[80]

Her claims also arise under Louisiana law but are based on her community property interest in Patrick's membership in the Company, together with unpaid child support obligations. Jenna bears the burden of proving her case. As such, the court will not give any credence or weight, much less draw any negative inferences, from Patrick's failure, for example, to document or explain the uses of Pandemic monies received by the Company.

As previously stated, the parties expressly consented to this court's power and authority to render a final judgment on any non-core matters.[81] That power and authority, in the court's view, necessarily includes the right, if equitable, to decline to render a final money judgment in favor of Jenna. For the reasons set forth below, the court feels strongly that the pending state court partition action is far better suited to sift through a comprehensive list of issues not really before this court, including when the community ended, and to tackle all the credits and setoffs appropriate in reaching a final partition of all the assets of the former community, not just the value of the Company.

A.      Child Support

Jenna's proof of claim includes $24,542.93 in child support owed by Patrick at the time the bankruptcy was filed. Patrick's counsel stipulated at trial that any child support ultimately determined by the state court, almost assuredly more than this amount, should constitute an allowed claim against the estate.

B.  Jenna's Community Property Interest in the Company

Jenna was never a member of the Company. However, she holds a community property interest in Patrick's 90% membership, as they have not yet partitioned community property.

---

[80] P-131, p. 22.

[81] P-17.

During a marriage, Louisiana C.C. art. 2352 provides that "[a] spouse who is a member has the exclusive right to manage, alienate, encumber, or lease the limited liability company interest."   However, La. C.C. art. 2354 qualifies that right by stating "[a] spouse is liable for any loss or damage caused by fraud or bad faith in the management of the community property."   In *Branch v. Branch*,[82] the court found:

> In interpreting La. C.C. art. 2354, the jurisprudence has recognized, since the 1980 community property revision, that no fiduciary duty exists with respect to management of community property. It seems that acting out of self interest is not enough to constitute fraud or bad faith under Article 2354. Rather, a subjective element, the intent to injure or the intent to reduce a spouse's community interest, must be established. In other words, more than financial injury must be shown.[83]

The standard of care owed is heightened once the community regime is terminated. La. C.C. art. 2369.3; it provides:

> A spouse has a duty to preserve and to manage prudently former community property under his control in a manner consistent with the mode of use of that property immediately prior to termination of the community regime. He is answerable for any damage caused by his fault, default, or neglect.

In *In re Provenza*, 316 B.R. 177 (Bankr. E.D. La. 2003),[84] the court held:

> At the time that a marriage is dissolved and the community property is subject to being partitioned, there is a fiduciary relationship between the ex-husband and wife. The former spouse having control and possession of any community asset owes a fiduciary duty to the spouse not in control.[85]

In *Saacks v. Saacks*,[86] the court found:

---

[82] *Branch v. Branch*, 2021-411 (La. App. 3 Cir. 12/8/21), 2021 WL 5819758.

[83] *Id*. at *5 (quoting *McClanahan v. McClanahan*, 03-1178, pp. 4-5 (La.App. 5 Cir. 2/23/04), 868 So.2d 844, 848, *writ denied*, 04-1175 (La. 9/3/04), 882 So.2d 609).

[84] *In re Provenza*, 316 B.R. 177 (Bankr. E.D. La. 2003).

[85] *Id*. at 217  (citing *McCarroll v. McCarroll*, 701 So.2d 1280, 1282 (La.1997); *Pitre v. Pitre,* 247 La. 594, 172 So.2d 693, 695 (1965); *Terry v. Terry,* 565 So.2d 997, 1001 (La.App. 1 Cir.1990); *Queenan v. Queenan,* 492 So.2d 902, 912 (La.App. 3d Cir.) *writ denied,* 496 So.2d 1045 (La.1986); *see also Brown v. Brown,* 680 So.2d 1203, 1211 (La.App. 2d Cir.1996)).

[86] *Saacks v. Saacks*, 05-365 (La. App. 5 Cir. 9/26/06), 942 So. 2d 1130.

La. C.C. art. 2369.3, comment (a) notes that this article imposes a higher standard of care in managing and maintaining former community property than the standard imposed during the marriage. The reason for the higher standard of care is that, after termination of the community property regime, the presumption that a spouse will act in the best interest of the community no longer exists. *Knighten v. Knighten,* 00–1662 (La.App. 1 Cir. 09/28/01), 809 So.2d 324, *writ denied,* 01–2846 (La.01/04/02), 805 So.2d 207. The spouse alleging improper management bears the burden of proving that the former spouse failed to manage and prudently preserve the former community property prior to partition. *Anding v. Anding,* 32,084 (La.App. 2 Cir. 8/18/99), 740 So.2d 253; *Drobnak v. Drobnak,* 97–0021 (La.App. 1 Cir. 2/20/98), 708 So.2d 1162 .... Bad faith is not required under La. C.C. art. 2369.3 because the spouse is "answerable for any damage caused by his fault, default or neglect." *Gibson v. Gibson,* 96–1472 (La.App. 3 Cir. 4/02/97), 692 So.2d 708, 710.[87]

The parties disagree as to the date the community property regime terminated.  That date is important because that is when Patrick's heightened duty of care kicked in.  Patrick contends that it terminated on July 6, 2022, the day the divorce decree was entered pursuant to La. C.C. art. 103(1). Jenna, on the other hand, contends that when the divorce was granted, the community property regime terminated retroactive to the date Jenna filed her first divorce petition on April 6, 2020.

For purposes of this adversary proceeding, the court finds that the pending state court proceeding is far better suited to determine the date the community property regime terminated, whether any retroactive feature applies, and perhaps most importantly, whether Jenna is entitled to damages that could ultimately figure into the partition of the former community.  This court's ruling as to Jenna, therefore, will be limited to declaratory relief.  First, the evidence at trial demonstrated that Patrick acted in bad faith in managing the Company on several occasions from 2019 through January of 2023.  He also breached his heightened fiduciary duty with respect to

---

[87] *Id*. at 1136.

his management of the Company after termination[88] by failing miserably to preserve the value of the Company by.

For example, the texts from Patrick in 2022 show an intent to injure Jenna as well as the Smiths. On February 14, 2022, Patrick sent the Smiths a text telling them, "I'm about to crush you financially …"[89] That same day, Patrick also texted the Smiths, "Jenna is going down, just get ready."[90] The court finds that irrespective of when the community terminated, Patrick breached his obligations to Jenna for management of the Company, under both La. C.C. art. 2354 and under the heightened standard of care under La. C.C. art. 2369.3. Ultimately, the decision to not cure the past due rent owed on the OLOL Store, despite receiving over $700,000 of Pandemic aid,[91] led to the demise of the Company and the value of her community property interest in it. The evidence adduced at trial reveals that her community property interest in the Company was worth no less than $257,400 in October of 2017[92] and plummeted all the way to $0 by January of 2023. What the Company may have been worth when the bad faith management, breach of the heightened fiduciary duty, and/or intentional conduct took place, mostly in 2022 and early 2023, was not tried before this court and is best left for the state court partition suit in any event.

---

[88] Although this court declines to rule upon the effective date of the termination of the community, the parties certainly do not contest that the outside date was July 6, 2022.

[89] Plaintiffs' Exhibit 3, p. 1.

[90] Plaintiffs' Exhibit 3, p. 1.

[91] This court did not hear evidence concerning what happened to much of the Pandemic aid thus believes the state court is in a far better position to determine whether Jenna benefited in any way from those uses.

[92] That number is 45% (half of his 90% interest) of the value of $572,000 placed on the Company when Sean's interest was purchased by Patrick.

28 U.S.C. § 1334(c)(1) affords the court broad discretion to abstain, providing in relevant part "nothing in this section prevents a district court in the interests of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding … related to a case under title 11." The court may raise abstention *sua sponte* at any point in the proceedings.[93] This is particularly true in a divorce proceeding. In *Peterson v. Peterson*,[94] the court explained:

> … , the Supreme Court has articulated two abstention doctrines, *Burford* and *Younger*, which are applicable to this case. *See Younger v. Harris*, 401 U.S. 37 (1971); *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). … "The *Younger* and *Burford* abstention doctrines ... are founded on considerations of comity and federalism," and they are meant to "'extricate the federal courts from situations where the assertion of jurisdiction would intrude into the state court['s] proper domain.'" *Lawrence v. Cohn*, 932 F. Supp. 564, 580 (S.D.N.Y. 1996) (quoting *Youell v. Exxon Corp.*, 48 F.3d 105, 108 (2d Cir. 1995)). Underlying *Burford* abstention is the "belief that in particular areas of the law any intervention by the federal court would have an impermissibly disruptive effect on state policies." 17A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4245 (3d ed. 2019); *accord Metro Riverboat*, 142 F. Supp. 2d at 767. "*Burford* abstention is appropriate where a major case presents issues of state law such that the state has an overriding interest in their determination." *United Home Rentals, Inc. v. Tex. Real Estate Comm'n*, 716 F.2d 324, 331 n.15 (5th Cir. 1983). Underlying *Younger* abstention is "a strong policy against federal intervention in state judicial processes in the absence of great and immediate irreparable injury to the federal plaintiff." *Moore v. Sims*, 442 U.S. 415, 423 (1979). **Courts routinely use both doctrines to abstain from domestic relations matters involving divorce, property division, and child custody.** *See, e.g., Pollard*, 354 F. App'x at 95 (*Burford* abstention); *Begum*, 2000 WL 554953, at *4 (*Burford* abstention); *Machetta v. Moren*, No. 16-CV-2377, 2017 WL 2805192, at *6 (S.D. Tex. Apr. 13, 2017) (*Younger* abstention), *report and recommendation adopted*, 2017 WL 2805002 (June 28, 2017), *aff'd*, 726 F. App'x 219 (5th Cir. 2018); *Lawrence*, 932 F. Supp. at 580-81 (*Younger* and *Burford* abstention).[95]

---

[93] *See Murphy v. Uncle Ben's, Inc.*, 168 F.3d 734, 737 n.1 (5th Cir. 1999); *see, e.g., Estate of Merkel v. Pollard*, 354 F. App'x 88, 89 (5th Cir. 2009) (*Burford* abstention); *Lawrence v. McCarthy*, 344 F.3d 467, 470 (5th Cir. 2003) (*Younger* abstention).

[94] *Peterson v. Peterson*, No. 4:18-CV-4837, 2019 WL 8017862 (S.D. Tex. Oct. 30, 2019*)* (footnotes omitted)*, report and recommendation adopted,* No. 4:18-CV-4837, 2020 WL 883224 (S.D. Tex. Feb. 21, 2020).

[95] *Id.* at *3-4 (emphasis added).

In *Peterson*, the court held that "divorce and property disputes implicate important state interests. The 'application of the *Younger* Abstention Doctrine to domestic relations cases is obvious and proper.'"[96]  Accordingly, this court will not quantify Jenna's damages related to the loss of value of the Company. The court also abstains from deciding her claims related to misuse of Company funds, lost profits, and FF&E.

## V.  Are Plaintiffs' Claims Non-Dischargeable?

Now the court turns its attention to whether Plaintiffs have proved that their claims, whether liquidated or not, should be excepted from Patrick's discharge.

### A. The Smiths' Claims

Section 523(a)(4) of the Bankruptcy Code excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."   In *In re Shcolnik*,[97] the Fifth Circuit held that "state law may create a fiduciary relationship whose breach leads to nondischargeability under § 523(a)(4)."[98]  As found above, La. R.S. 12:1314(A)(1) is clear that a member who manages a limited liability company ("LLC") has a fiduciary duty to the other members. The Fifth Circuit discussed defalcation while acting in a fiduciary capacity in *In re Whitaker*.[99]

> Defalcation is the neglect of a fiduciary duty. *Shcolnik,* 670 F.3d at 628. The Supreme Court … clarified that the state of mind necessary to prove defalcation is "one involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Bullock v.*

---

[96] *Id*. at *8.

[97] *In re Shcolnik,* 670 F.3d 628 (5th Cir. 2012).

[98] *Shcolnik*, 670 F.3d at 628.

[99] *In re Whitaker*, 642 F. App'x 345, 348 (5th Cir. 2016).

*BankChampaign, N.A.,* [569] U.S. [267], 133 S.Ct. 1754, 1757, 185 L.Ed.2d 922 (2013).[100]

According to the U.S. Supreme Court in *Bullock*, defalcation requires at a minimum, "gross recklessness."[101]  The court finds that Patrick's actions and inactions were the reasons why the Company valued at no less than $572,000 in late 2017 was rendered worthless in less than six years.  Stated another way, the Smiths proved by a preponderance of the evidence that Patrick was a fiduciary and was grossly reckless in managing the Company.   Therefore, the $93,040 judgment, which mirrors their allowed proof of claim, is nondischargeable pursuant to section 523(a)(4) of the Bankruptcy Code. Based on a finding of defalcation while acting as a fiduciary, the court need not address the fraud grounds under section 523(a)(4).

The court will also address whether the $93,040 debt is also nondischargeable under 11 U.S.C. § 523(a)(6).  Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." In *Matter of Miller*,[102] the Fifth Circuit held that "an injury is 'willful and malicious' where there is either an objective substantial certainty of harm or a subjective motive to cause harm.[103] The Fifth Circuit held in *Williams v. International Brotherhood of Electrical Workers Local 520,*[104] that "section 523(a)(6) excepts contractual debts from discharge when those debts result from an intentional or substantially certain injury…."

---

[100] *Whitaker,* 642 F. App'x at 348.

[101] Similarly, under Louisiana law, in order for a managing member to be personally liable to another member for a breach of fiduciary duty, requires at a minimum, a finding of "gross negligence."  La. R.S. § 12:1314(B).

[102] *Matter of Miller*, 156 F.3d 598 (5th Cir. 1998).

[103] *Id.* at 606.

[104] *Williams v. International Brotherhood of Electrical Workers Local 520 (In re Williams)*, 337 F.3d 504, 510 (5th Cir. 2003).

Patrick's blatant refusal to share the books and records over the course of a full year or more, the unilateral increases in salary at a time when the Stores were facing challenges, the incendiary texts he sent to the Smiths and Jenna, the failure to pay almost $100,000 in back rent despite receiving over $700,000 in loans and grants, and the abandonment of the OLOL Store and its FF&E together overwhelming show that Patrick had a subjective motive to cause harm to the Smiths. Additionally, those actions were objectively and substantially certain to cause them harm. The court finds that the Smiths' claim for $93,040 is also nondischargeable pursuant to section 523(a)(6) of the Bankruptcy Code.

### B. Jenna's Claims

#### 1. Section 523(a)(5)

Any child support award ultimately determined by the state court is a nondischargeable domestic support obligation pursuant to 11 U.S.C. § 523(a)(5). The judgment in this case in favor of Jenna will reflect that.

#### 2. Section 523(a)(4)

As mentioned above, section 523(a)(4) of the Bankruptcy Code excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Patrick owed Jenna a fiduciary duty to preserve the Company as a community property asset from the date the community property regime terminated. Again, this court is not going to fix that date. This court merely holds that Patrick breached his heightened duty of care after the termination of the community by, among other things, intentionally failing to pay rent on the OLOL Store and abandoning the location altogether. These clear breaches legally caused the Company to lose all remaining value. Therefore, the court finds that any claim, defense, or offset

based on these breaches by Patrick for the loss of the value of the Company are nondischargeable pursuant to section 523(a)(4) of the Bankruptcy Code.

### 3. Section 523(a)(6)

As to any damages suffered by Jenna before the termination of the community, also to be determined in the state court proceeding, this court expressly holds that she suffered damage "for willful and malicious injury by the debtor to another entity or to the property of another entity." In *Matter of Miller*,[105] the Fifth Circuit held that "an injury is 'willful and malicious' where there is either an objective substantial certainty of harm or a subjective motive to cause harm.[106] The Fifth Circuit held in *Williams v. International Brotherhood of Electrical Workers Local 520*,[107] that "section 523(a)(6) excepts contractual debts from discharge when those debts result from an intentional or substantially certain injury…."

Jenna carried her burden of proof that Patrick acted in bad faith in managing the Company before the community terminated.  Those actions were objectively and substantially certain to cause Jenna harm by devaluing her community property interest.  The court finds that any portion of Jenna's claim before termination of the community is nondischargeable pursuant to section 523(a)(6).

## VII.  Conclusion

Based on the foregoing, the court finds that the Smiths are entitled to a money judgment equal to their proven expectation damages in the aggregate amount of $93,040, comprised of (1) the $6,740 still due on the $50,000 loan made in September 2014, (2) the $12,000 loan made in

---

[105] *Matter of Miller*, 156 F.3d 598 (5th Cir. 1998).

[106] *Id*. at 606.

[107] *Williams v. International Brotherhood of Electrical Workers Local 520 (In re Williams)*, 337 F.3d 504, 510 (5th Cir. 2003).

November 2019, and (3) the remaining $74,300 of the $80,000 contribution they made in exchange for a 10% interest in the Company.  In turn, their allowed unsecured claim in this bankruptcy is also $93,040.  Finally, that damage claim is nondischargeable in its entirety pursuant to 11 U.S.C. §§ 523(a)(4) and (a)(6).

As to Jenna, this court will abstain from ruling on the extent of her damages, if any, for Patrick's actions leading to the demise of the Company.  This court's declaratory judgment will find in favor of Jenna, expressly stating that any child support award ultimately determined by the state court is a nondischargeable domestic support obligation pursuant to 11 U.S.C. § 523(a)(5), and any damages awarded to her in the state court partition suit related in any way to his mismanagement of the Company are also non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(4) and (a)(6).  Once that determination is made by the state court, Jenna will have an opportunity to amend her proof of claim in this bankruptcy proceeding.  The court will enter separate judgments consistent with this Memorandum Opinion.

Baton Rouge, Louisiana, February 13, 2025.

**/s/ Michael A. Crawford**
MICHAEL A. CRAWFORD
UNITED STATES BANKRUPTCY JUDGE